BEEZER, Circuit Judge:
 

 Pioneer Liquidating Corporation (“PLC”) appeals the decision of the Bankruptcy Appellate Panel (“BAP”), affirming the bankruptcy court’s order converting a failed Chapter 11 reorganization to a Chapter 7 estate and requiring PLC to make an accounting and turn over assets to a Chapter 7 trustee. We have jurisdiction, 28 U.S.C. § 158(b)-(e), and we affirm.
 

 I
 

 In January 1991, six debtors, collectively known as Consolidated Pioneer Mortgage Entities (“Debtor”), filed consolidated petitions for relief under Chapter 11 of the Bankruptcy Code. In response to disputes that arose among factions of the 2,800 investors regarding their expected returns from the bankruptcy estate, the Debtor and the Official Creditors’ Committee filed a Joint Plan of Reorganization (“Joint Plan”) in 1992.
 

 The Joint Plan created PLC as an independent liquidating corporation “formed in a manner to implement and fulfill the pur
 
 *805
 
 poses of the Plan.” According to the Joint Plan:
 

 [T]here will be a voluntary transfer of Investors’ alleged interests in notes and trust deeds, as well as any proceeds thereof, including cash, in exchange for a right to payment from a Liquidating Corporation [PLC] which will be formed for the purpose of (1) taking title to all of the assets of the Debtors and the alleged Investor interests, (2) liquidating and converting to cash the assets so acquired, (3) resolving claims disputes, and (4) disbursing to Creditors and Investors their entitlements under the [Joint] Plan.
 

 In addition, the Joint Plan provided for the creation of a board of directors (“Board”) and assigned to PLC duties and powers to manage the estate properties; compromise claims; examine proofs of claims; and hire professionals to help in its day-to-day operations. PLC was further charged with investigating and pursuing all appropriate and cost-effective actions on behalf of the Debtor’s estate, to the end of “disbursing] to Creditors and Investors their entitlements under the Plan.”
 

 The investors had no ownership or voting interest in PLC. Each investor had a right to payment from PLC’s assets based on the investor’s net loss, though the Joint Plan did not guarantee a specific amount of return to investors. Investors were entitled to pro rata distributions from the liquidation of the Debtor’s assets remaining after the costs of implementing the Joint Plan. The first distribution was to be within 60 days of the Joint Plan’s effective date; thereafter distributions were to be made as soon as the amount of unrestricted cash available for distribution exceeded $1 million.
 

 The bankruptcy court retained broad jurisdiction under the Joint Plan. It was empowered to resolve objections to claims; compensate professionals; entertain applications for contracts or leases; consider pending applications and modifications to the plan; and resolve claims for relief based on transactions that occurred before the date of the bankruptcy petition. The catchall provision further empowered the court to:
 

 determin[e] all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of this Plan, including, without limitation, the actions of the Board of Directors and the shareholders of the Liquidating Corporation; [and] determin[e] such other matters as may arise in connection with this Plan or the Confirmation Order.
 

 Relying on PLC’s “opinion ... estimate” that the return on their claims would be 35 cents on the dollar, the investors voted to confirm the Joint Plan in June 1992. At that time, the Debtor’s assets were valued at about $80 million. By 1997, virtually all the assets had been liquidated. PLC distributed more than $21.6 million to the investors, who were also able to report tax deductible losses of $100 million in 1992, the year of confirmation. In addition, PLC anticipated future income from a major potential asset, a pending lawsuit against California banks (“Bank Litigation”), with an estimated value of $125 million. PLC also anticipated that the investors would profit from reported losses incurred in the disposal of its assets, including a federal net operating loss (“NOL”) carryover of about $31.1 million for the fiscal year ending June 30, 1996, which PLC alleged could result in more than $12.1 million in tax savings.
 

 In April 1993, PLC informed investors that the expected rate of return would be reduced from 35 percent to 15 to 20 percent. Distributions were forecast to occur in the later years of the plan. Frustrated
 
 *806
 
 by the Board’s refusal to provide complete and accurate financial information, investors sought an order requiring PLC to provide financial reports comparing the actual results of the liquidation to the projections PLC made in soliciting their votes for the Joint Plan. After a hearing, the bankruptcy court denied the motion with prejudice, concluding that the provision of financial records was at “the discretion of the board of directors, and this court has no role in directing them to do this.”
 

 In May 1997, PLC moved to extend the five-year tenure of the Board, as required by the Joint Plan. The investors opposed the motion based on PLC’s continued refusal to provide the requested financial information. The bankruptcy court granted a six-month extension. Six months later, in response to PLC’s second request, the court extended the Board’s term until January 15, 1999. An investor simultaneously applied for the appointment of an examiner, claiming that PLC had failed to provide the investors with financial accounting, case status information and anticipated distributions. Although the bankruptcy court agreed to appoint an examiner, it stayed the appointment to give PLC an opportunity to file pleadings regarding financial disclosure. PLC responded that it would disclose information only if the court refused to entertain subsequent motions seeking additional information and vacated the order appointing the examiner.
 

 The bankruptcy court vacated its stay of the order appointing the examiner because “the heavily conditioned offer of certain documents submitted by [PLC] was not sufficient to meet its fiduciary obligations to the investor constituency of this Chapter 11 case, and ... no showing was made that any particular documents should not be disclosed.”
 
 [1]
 

 In December 1998, responding to PLC’s third request for an extension of the Board’s tenure, the bankruptcy court expressed its lack of confidence in the Board and directed the parties to recommend a course of action “supported by the plan and the law.” The United States Trustee (“Trustee”) moved to convert the case to Chapter 7. Despite PLC’s opposition, the bankruptcy court converted the case, concluding that “given the purpose for the creation of PLC, it is clear to virtually all that it is acting as a liquidating trust. Simply stated, PLC has a fiduciary relationship with the investors.” The court found that PLC’s failure to comply with its “fundamental duty to provide an adequate accounting of financial activity” constituted cause to convert. The court kept the Board in place until the Chapter 7 trustee could recommend whether it should continue to serve and ordered PLC to turn over all records and property of the estate to the Chapter 7 trustee as well as file a complete accounting.
 

 The BAP affirmed the bankruptcy court,
 
 Pioneer Liquidating Corp. v. U.S. Trustee (In re Consol. Pioneer Mortgage Entities),
 
 248 B.R. 368 (9th Cir.BAP 2000), and PLC timely appeals.
 

 II
 

 We review decisions of the BAP de novo.
 
 Mitchell v. Franchise Tax Bd., State of Cal. (In re Mitchell),
 
 209 F.3d 1111, 1115 (9th Cir.2000). We defer to the bankruptcy court’s findings of fact in the absence of clear error.
 
 Id.
 
 The decision to convert the case to Chapter 7 is within the bankruptcy court’s discretion.
 
 Richter v. Klein/Ray Broad. (In re Klein/Ray Broad.),
 
 100 B.R. 509, 511 (9th Cir.BAP 1987). Such a decision “will be reversed only if based on an erroneous conclusion of
 
 *807
 
 law or when the record contains no evidence on which [the bankruptcy court] rationally could have based that decision.”
 
 Benedor Corp. v. Conejo Enter., Inc. (In re Conejo Enter., Inc.),
 
 96 F.3d 346, 351 (9th Cir.1996) (quotation marks omitted).
 

 Ill
 

 PLC argues that conversion is technically futile. It asserts that although 11 U.S.C. § 1112(b)
 
 [2]
 
 provides for the conversion of a confirmed plan in certain situations, 11 U.S.C. § 1141
 
 [3]
 
 vests all property of a bankruptcy estate in the debtor when a plan is confirmed. Because the Chapter 11 estate vanished upon confirmation, PLC contends, no estate existed to be converted to Chapter 7 for administration by a Chapter 7 trustee.
 

 We disagree. The language and purpose of the Joint Plan demonstrate that assets that vested in PLC upon confirmation revested in the estate when the bankruptcy court converted the case to Chapter 7. Although typically confirmation of a plan “terminates the existence of the estate[,] ... reversion of property from the estate to the debtor upon confirmation contained in 11 U.S.C. § 1141(b) is explicitly subject to the provisions of the plan.”
 
 Hillis Motors, Inc. v. Hawaii Auto. Dealers’ Ass’n,
 
 997 F.2d 581, 587 (9th Cir.1993);
 
 see
 
 11 U.S.C. § 1141(b) (providing that property of the estate vests in the debtor upon plan confirmation
 
 “except as otherwise provided in the plan
 
 ”) (emphasis added).
 

 Despite the fact that the Joint Plan in this case did not specifically provide that remaining assets would revest in the estate in the event of conversion, it (1) contains explicit provisions regarding the distribution of liquidation proceeds to the investors, the plan’s primary beneficiaries; and (2) gives the bankruptcy court broad powers to oversee implementation of the plan.
 
 [4]
 

 See Hillis,
 
 997 F.2d at 589 (concluding that assets revested in estate after confirmation because, although plan did not explicitly so provide, plan’s clear purpose was to pay back creditors, and plan stated that bankruptcy court would be closely involved in administering Chapter 11 estate).
 
 [5]
 
 Contrary to PLC’s assertions, PLC was not created to be an independent for-profit corporation. Rather, the Joint Plan directed PLC to distribute proceeds for the benefit of the investors. The Joint Plan further placed
 
 *808
 
 PLC under the supervision of the bankruptcy court, empowering the court to “determine all controversies, suits and disputes that may arise ... including, without limitation, the actions of the Board of Directors ... [and] such other matters as may arise in connection with this Plan or the Confirmation Order.” Under these circumstances, assets .held by PLC for the benefit of the investors become assets of the estate upon conversion to Chapter 7.
 
 [6]
 

 IV
 

 PLC also argues that even assuming that post-confirmation conversion is possible, the bankruptcy court abused its discretion in ordering conversion. Specifically, PLC contends that (1) PLC did not owe a fiduciary duty to the investors to provide an accounting; and (2) PLC’s failure to account did not cause unreasonable prejudicial delay under § 1112(b). Again, we disagree.
 

 A
 

 The bankruptcy court correctly detérmined that PLC had a fiduciary duty to account to the investors, the absence of the word “trust” from the plan language notwithstanding. The Joint Plan makes clear that PLC was created for the exclusive benefit of the investors and directed to “liquidat[e] and convert[ ] to cash the assets [of the Debtor] and ... disburs[e] to Creditors and Investors their entitlements under the Joint Plan.” It follows that PLC had a fiduciary duty to the investors, for whose benefit PLC was created, including the duty to account: PLC is like an “as-signee for the benefit of ... creditors ... who takes possession of and liquidates property of a debtor for distribution to creditors.”
 
 Holywell Corp. v. Smith,
 
 503 U.S. 47, 52, 54, 112 S.Ct. 1021, 117 L.Ed.2d 196 (1992) (quotation marks omitted) (concluding that trustee appointed to liquidate and distribute debtor’s property under Chapter 11 plan had duties of “fiduciary” and must pay taxes as such);
 
 see also Otto v. Niles (In re Niles),
 
 106 F.3d 1456, 1462 (9th Cir.1997) (“Basic principles of the law of fiduciaries ... place the burden to render an accounting on the fiduciary once the principal has shown that funds have been entrusted to the fiduciary and not paid over or otherwise accounted for.”).
 
 [7]
 

 B
 

 The bankruptcy court did not abuse its discretion when it concluded that there was cause to convert to Chapter 7. Just as “unreasonable delay by the debtor that is prejudicial to creditors” constitutes cause to convert, so does unreasonable delay by a corporation entrusted with liqui
 
 *809
 
 dating an estate, such as PLC.
 
 See
 
 11 U.S.C. § 1112(b)(3). PLC caused unreasonable delay by repeatedly failing to account to the investors; the delay was prejudicial because the goals of the Joint Plan (liquidation of assets and distribution to investors) were not being met. For five years preceding conversion, the investors’ dissatisfaction with the lack of distributions was compounded by PLC’s refusal to provide financial information. As PLC continued to stall and as the Board requested further extensions, the costs of administering PLC (including the Board’s salaries) continued to mount, depleting the assets available for distribution. In light of PLC’s attempts to prevent the appointment of an examiner and otherwise eschew its duty to account, the bankruptcy court properly determined that conversion to Chapter 7 was necessary to ensure open and full financial disclosure.
 
 [8]
 

 AFFIRMED.
 

 [1]
 

 . The bankruptcy court never appointed an examiner because of PLC's pending appeal of the appointment order. PLC's appeal was eventually dismissed as interlocutory.
 

 [2]
 

 . A bankruptcy court may convert a case to Chapter 7, when it is in the best interest of the creditors and the estate, “for cause, including. .. (7) inability to effectuate substantial consummation of a
 
 confirmed plan;
 
 (8) material default by the debtor with respect to a
 
 confirmed plan."
 
 11 U.S.C. § 1112(b) (emphasis added).
 

 [3]
 

 . Section 1141 provides, in relevant part:
 

 (b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.
 

 (c) Except ... as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of the general partners in the debtor.
 

 11 U.S.C. § 1141(b), (c).
 

 [4]
 

 . Even those courts ultimately concluding that assets do not revest in the estate after confirmation concede that reversion in the debtor is subject to the provisions of the plan, as per § 1141(b).
 
 See, e.g., In re K & M Printing, Inc.,
 
 210 B.R. 583, 585 (Bankr.D.Ariz.1997);
 
 In re T.S.P. Indus., Inc.,
 
 117 B.R. 375, 378-79 (Bankr.N.D.Ill.1990).
 

 [5]
 

 .
 
 See also Smith v. Lee (In re
 
 Smith), 201 B.R. 267, 273 n. 5 (D.Nev.1996) (“[P]roperty re-vested in the Debtor upon confirmation becomes property of a Chapter 7 estate upon conversion.”),
 
 aff'd,
 
 141 F.3d 1179, 1998 WL 133445 (9th Cir.1998);
 
 Carey v. Flintridge Lumber Sales, Inc. (In re RJW Lumber Co.),
 
 262 B.R. 91, 93 (Bankr.N.D.Cal.2001) ("The far better view, consistent with an integrated interpretation of the Code, is that upon con
 
 *808
 
 version the Chapter 7 estate consists of all remaining assets held for the benefit of creditors.'');
 
 In re Calania Corp.,
 
 188 B.R. 41, 43 (Bankr.M.D.Fla.1995) (concluding that "properties which were subject to the confirmed plan ... will be properties of the estate in a Chapter 7 case”).
 

 [6]
 

 . We also reject PLC’s argument that conversion is not in the best interest of the creditors and estate because of PLC's alleged control over certain assets. We agree with the BAP that conversion does not put at risk PLC's ability to collect the proceeds of the Bank Litigation; the Trustee has standing to pursue such litigation; and it is premature to determine ownership of the NOL.
 
 See In re Consol
 
 idated
 
 Pioneer Mortgage Entities,
 
 248 B.R. at 382, 382 n. 12, 383, 383 n. 13.
 

 [7]
 

 . We reject PLC’s argument that the bankruptcy court’s refusal to order an accounting upon the investors' first request in 1993 precluded the court from finding, four years later, PLC had a duty to account. We agree with the BAP that the 1993 order "merely dealt with that discrete request at that particular point in time. The 'with prejudice' aspect did not provide a perennial safe haven for future irresponsible and arrogant conduct.”
 
 In re Consol. Pioneer Mortgage Entities,
 
 248 B.R. at 377.
 

 [8]
 

 . We need not address the Trustee’s additional arguments that there was cause for conversion based on PLC’s "inability to effectuate substantial consummation of a confirmed plan” and "material default by the debtor with respect to a confirmed plan.” 11 U.S.C. § 1112(b)(7)-(8).